1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

CHARLES H. BRACEY,                                    No. C 04-03374 WHA

       Petitioner,

   v.                                                           **ORDER DENYING PETITION**
                                                                    **FOR WRIT OF HABEAS CORPUS**
CLAUDE FINN, Warden,

       Respondent.
_____/

## INTRODUCTION

Petitioner Charles Henry Bracey is serving a sentence of 28 years and four months to life for felony battery, false impersonation, possession of stolen property, and possession of a forged instrument. The felony battery conviction qualified as petitioner's "third strike." Petitioner seeks federal habeas corpus relief pursuant to 28 U.S.C. 2254 on the ground that he received ineffective assistance of counsel. This order finds that relief is not warranted. The petition is therefore **DENIED**.

## STATEMENT

On November 16, 2000, petitioner was convicted of possession of a stolen credit card, possession of a counterfeit bill, false impersonation exposing the victim to liability, and felony battery with great bodily injury by a jury in Santa Clara County Superior Court. The following evidence was presented at trial.

**United States District Court**
For the Northern District of California

1
2
3
4
5
6
7

James Ross, the victim, testified that he and petitioner were regulars at the French Quarter, a club and cabaret located in Sunnyvale.  One evening on or around May 9, 1999, Ross purchased his usual drink of Calistoga water at the bar, when petitioner walked by him and whispered in his ear that he was "pretty."  Ross, angry and perplexed because he felt the comment insinuated that he was gay, continued to drink his water.  Approximately five minutes later, petitioner once again approached Ross and whispered "You are pretty."  Ross did not respond.

8
9
10
11
12
13
14
15
16
17
18
19
20

James Ross saw petitioner in the French Quarter again on May 16, 1999.  Ross approached petitioner and asked to speak with him.  Ross confronted him about the "pretty" incident the previous week, but petitioner denied making the comment.  Ross denied that he was homosexual and warned petitioner not to approach him in that manner again.  Approximately fifteen minutes later, petitioner approached Ross and in a threatening tone said, "You loud talked me."  Ross denied it.  Petitioner suggested that the two step outside to discuss it further.  Outside, petitioner admitted that he had called Ross "pretty," but that he had meant it as a compliment.  Ross stated that he did not like that type of compliment and repeated that he was not gay.  The conversation continued briefly, the two shook hands, and Ross turned to walk away.  As Ross walked away, petitioner said, "Don't loud talk me."  Ross turned back when petitioner punched Ross in the face with his fist while using choice profanity.  Petitioner struck Ross with several more blows to the face.  Ross could not see and did not recall whether he was standing, kneeling, or on the ground when each successive punch was thrown.

21
22
23
24
25
26
27

Ross lost consciousness.  He could not remember anything until paramedics arrived and began attending to him.  Ross additionally testified that Barbara Mack, a bartender at the French Quarter, was also present.  She assisted him by retrieving his coat and camera.  Mack also offered, he said, to hold on to the rings he had been wearing.  As a result of the injuries, Ross underwent four-and-one-half hours of plastic surgery.  He suffered a broken nose and crushed eye sockets requiring the insertion of steel plates.  Ross also suffered a permanent loss of feeling on the right side of his gums and teeth.

28

2

**United States District Court**
For the Northern District of California

1
2
3
4
5
6
7

Michael Bronko, owner of Lucky Shop Billiard, which is located in the basement of the French Quarter's building, was working the evening of the incident. Bronko testified that around ten o'clock that evening someone in the pool hall told him that there was a fight outside. Bronko went outside and saw a man sitting on the ground bleeding profusely from his head. A woman was attending to him administering aid. Another man was leaving the area and getting into a silver convertible BMW. Bronko heard this man say "That will teach you to mess with me."

8
9
10
11
12
13
14
15
16
17
18
19
20
21

Sunnyvale Police Officer Robert Hall was the first officer to arrive at the scene. Officer Hall testified that he arrived to find Ross severely beaten and bleeding profusely. He observed that Ross was dazed and confused and that a woman was assisting him. Ross told Officer Hall that he thought his assailant's name was Demarco, that the assailant was a regular patron at the French Quarter, and drove a gray or silver BMW. Officer Hall testified that Ross's testimony at trial was consistent with the statement he made for the police report the night of the incident. Working off a further tip provided by Ross in October 1999, Sunnyvale police identified a suspect and composed a photographic lineup. Ross identified petitioner from the lineup. A probable-cause affidavit was filed. On November 21, 1999, Officer Craig Anderson of the Sunnyvale Police Department noticed a vehicle matching the description in the affidavit parked near the French Quarter. Petitioner was subsequently arrested. During the arrest, petitioner identified himself as Reginald Lucas and provided a false driver's license and social security card in that name. Officer Anderson also found a counterfeit fifty dollar bill and two stolen credit cards in petitioner's wallet.

22
23
24
25
26
27
28

Petitioner did not testify at trial. Instead the defense called Barbara Mack, a bartender at the French Quarter on the evening of the incident and private investigator Susan Mitchell. Barbara Mack testified that she, petitioner, and others were at the bar kidding around when Ross entered the club that evening. He walked directly up to petitioner and told him that he needed to watch what he said about people and to stop making fun of other people's clothes. Petitioner did not reply. Ross left and went into the bathroom. Later, Ross returned and again approached petitioner. Ross stated that he was not "a punk," and then warned petitioner that he

3

should watch what he said or he would get hurt.  Petitioner denied knowing to what Ross was referring; Ross called him a liar.  After numerous attempts by petitioner to walk away from Ross, club management had to tell Ross to stop or they would be forced to remove him from the club.  Mack saw Ross and petitioner leave the bar, but did not witness the fight.

After the fight, Mack went outside and assisted Ross to his feet.  According to Mack, Ross's first words were "I shouldn't have swung at him, I wasn't prepared."  (Ross denied making this statement).  Until the ambulance came, Mack assisted Ross by fetching towels, ice, and a chair so that he could sit down.  She did not speak with the police the night of the incident and could not recall any officers arriving while she was outside.  She denied taking any of Ross's rings, which were missing after the incident.  After petitioner had been arrested, the police questioned her about the counterfeit money, but did not ask her any questions regarding the events surrounding the fight.  Mack, however, did later tell a defense investigator everything she could remember about the night, including Ross's statement that he should not have swung because he was not prepared.  She also explained that she did not go to the police with her information because she felt that the police should have come to the club to investigate and interview her.  Mack admitted that she found Ross to be an "obnoxious nuisance" but did not dislike him.  She considered Ross a nuisance because he would nurse a single Calistoga water all evening at the club, leave small tips, and annoy women when he tried to pick them up.  Mack also admitted having a 1987 felony conviction for drug-trafficking.

Susan Mitchell, an investigator for the defense, testified before the jury that she interviewed four people from the French Quarter who had not been interviewed by the police.  According to Mitchell, Mack's statement to her was consistent with her trial testimony except for one point.  Mack did not tell her about Ross's warning to petitioner that if he did not watch what he said he would get hurt.

*          *          *

Petitioner was charged in an information filed on December 23, 1999, with possession of stolen property, possession of a forged instrument, false impersonation and felony battery inflicting great bodily injury.  The information further alleged two prior felony strike

4

**United States District Court**
For the Northern District of California

convictions for residential burglary and assault with a deadly weapon. Petitioner pleaded guilty to the two possession offenses and admitted having two prior felony convictions. On November 16, 2000, a jury found petitioner guilty of felony battery and false impersonation, but found the personal infliction of great bodily injury not to be true.

At sentencing, the court dismissed the strike priors on the possession and false impersonation convictions but refused to strike the priors on the battery charge. The court imposed a term of 25 years to life for the felony battery, and one-third the midterm to each of the remaining three counts for a total sentence of 28 years, four months to life. The court also ordered restitution.

Petitioner has exhausted state remedies. While his direct appeal was pending in the state appellate court, he filed a state habeas corpus petition alleging ineffective assistance of trial counsel. The habeas corpus petition was consolidated with his appeal. The state appeals court affirmed the conviction and summarily denied petitioner's writ of habeas corpus on May 30, 2003. The California Supreme Court denied the petition for review with respect to the direct appeal on August 20, 2003, and summarily denied the habeas corpus petition without comment on September 17, 2003. Petitioner timely filed the instant petition for writ of habeas corpus pursuant to 28 U.S.C. 2254 on August 17, 2004. Petitioner has not requested an evidentiary hearing.

**ANALYSIS**

**1.    STANDARD OF REVIEW.**

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") applies to petitioner's case. Under AEDPA, federal courts may grant a writ of habeas corpus only if the state-court ruling: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court; or (2) was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. 28 U.S.C. 2254(d). A state-court decision is "contrary to" federal law if it fails to apply the correct controlling Supreme Court authority or comes to a different conclusion when presented with a case involving materially indistinguishable facts.

*Bell v. Cone*, 535 U.S. 685, 694 (2002). A decision is an "unreasonable application" of Supreme Court law if the state court identifies the correct legal standard but applies it in an unreasonable manner to the facts before it. *Ibid.* "Unreasonable" is not the same as incorrect. It is instead comparable to the "clear error" standard – *i.e.*, reversal is allowable only where the reviewing court is left with a "firm conviction" that error has been committed. *Van Tran v. Lindsey*, 212 F.3d 1143, 1153–54 (9th Cir. 2000). "Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary." 28 U.S.C. 2254(e)(1).

### 2. PETITIONER'S CLAIMS AND APPLICABLE LEGAL STANDARD.

Petitioner seeks relief on the ground that his Sixth Amendment rights were violated due to ineffective assistance of trial counsel. He contends that defense counsel, Mr. Kurt Robinson, failed to provide appropriate discovery to the prosecution, which caused counsel to unnecessarily agree to waive petitioner's right to call two crucial defense witnesses instead of seeking a continuance. He claims that counsel failed to conduct adequate pretrial investigation, was insufficiently familiar with the case's underlying facts and law, and failed to adequately interview petitioner.

Claims alleging the ineffective assistance of counsel are evaluated under the two-part test set forth in *Stickland v. Washington*, 466 U.S. 668 (1984). A petitioner must demonstrate that: (1) counsel's actions were outside the wide range of professionally competent assistance, and (2) that the petitioner was prejudiced by reason of counsel's actions. To prevail on such a claim, a petitioner must overcome the strong presumption that counsel's conduct falls within a wide range of reasonable professional assistance. *Id.* at 668, 686–90. Petitioner bears the burden of overcoming the presumption that counsel's actions were in accordance with sound trial strategies. *Id.* at 690. Furthermore, if it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, a court need not analyze whether counsel's action was reasonable. *Id.* at 698.

### 3. PETITIONER IS NOT ENTITLED TO RELIEF FOR ALLEGED INEFFECTIVE ASSISTANCE OF COUNSEL.

The state appellate court and the California Supreme Court both summarily denied petitioner's habeas claim without comment. Given that there is no reasoned opinion by the state

6

courts as to the substance of petitioner's request for habeas relief, this Court must perform an independent review of the record to ascertain whether the decisions of the state courts were objectively reasonable. *Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003).  On the record presented, this order finds that petitioner cannot prevail on his ineffective assistance of counsel claim.

Petitioner's allegations center on trial counsel's supposed failure to provide timely discovery of potential witnesses, and Mr. Robinson's subsequent waiver of petitioner's right to call Cheryl Lewis and Kermit Harris as witnesses.  The discovery issue was addressed in trial court proceedings held on November 7, 2000 (Exh. 13).

At that hearing, the court denied the prosecution's request for a continuance.  The defense had submitted the names and statements of approximately fourteen possible witnesses the day before, and the prosecution feared their testimony could have a significant impact on the outcome of the case.  The prosecutor provided the names of four witnesses he was particularly concerned about.  These included Gary Herd, Kermit Harris, Cheryl Lewis, and Barbara Mack. Defense counsel informed the court that Cheryl Lewis was not on his trial list, and that although Gary Herd and Kermit Harris were on his list, he did not intend to call them as witnesses.  With respect to Barbara Mack, defense counsel acknowledged that she was a crucial witness, and reasoned that since Ms. Mack was listed in the police reports and was the bartender on duty the evening of the incident, the prosecution was aware of her for some time and therefore had ample opportunity to interview her.  The court agreed that the prosecution had adequate notice and sufficient time to interview Ms. Mack.  With respect to the other witnesses, defense counsel settled the matter by telling the court, ". . . we can solve the problem by saying this, we won't call and we tell the court [the prosecution] won't be prejudiced by not getting their statements, we will not use those witnesses" (Exh. 13 at 8).  The court found the answer satisfactory and proceeded with the trial as scheduled.

Based on these proceedings, petitioner contends that counsel's waiver of key witnesses involved no strategy or tactical decision, but was instead a result of counsel's ignorance of the information in his file and the facts of the case.  Specifically, petitioner claims that

United States District Court

For the Northern District of California

1   Mr. Robinson failed to conduct adequate pretrial investigation, misrepresented that

2   Cheryl Lewis was not on his witness list, and either did not know what his witness statements

3   contained, or he deliberately lied to the court to hide his incompetence.

4       The record does not support petitioner's contentions.  The choice of what particular

5   defense to present is a matter usually within the discretion of the attorney, even if it is unwise.

6   *See e.g.*, *Rodriquez-Gonzalez v. INS*, 640 F.2d 1139, 1142 (9th Cir. 1981).  Tactical decisions

7   that are not objectively unreasonable do not constitute ineffective assistance of counsel.  Indeed,

8   "[f]ew decisions a lawyer makes draw so heavily on professional judgment as whether or not to

9   proffer a witness at trial."  *Lord v. Wood*, 184 F.3d 1083, 1095 (9th Cir. 1999).

10      Trial counsel's decision not to call Cheryl Lewis and Kermit Harris and rely on the

11  testimony of Barbara Mack was reasonable.  First, Cheryl Lewis's statement was weak.  The

12  statement was taken over the telephone by the defense investigator and was only eight sentences

13  long (Exh. C).  Some of the statement was hearsay.  What was not hearsay, was weakened by

14  the fact that Ms. Lewis was engaged in a conversation with Barbara Mack during much of the

15  incident, and ". . . did not see where Ross and D'Marco* went or what happened."  She also

16  stated that she did not even know what Ross was talking about.  Since Ms. Lewis could not put

17  Ross's words into context, she could easily have misconstrued his statements.  She stated that

18  "[w]hen she went outside, she saw Ross bleeding and D'Marco was nowhere in sight."  Such

19  testimony would at best have been marginally helpful to the defense and may even have been

20  counterproductive.

21      Additionally, the record does not support petitioner's contention that Mr. Robinson

22  misrepresented that Ms. Lewis was not on his witness list.  While Lewis's name appears on a

23  document under the heading "Witness List" taken from Mr. Robinson's file, there is insufficient

24  evidence before the Court that this is a copy of the *same* witness list provided to the

25  prosecution.  The witness list referred to by petitioner in Exhibit B is not dated, includes no

26  indication that the document was provided to prosecution, and only lists eight potential

27  witnesses.  At the November 7 hearing, the prosecutor stated that he was given the statements of

28

* Petitioner Bracey was known in the French Quarter only by the name of D'Marco or Demarco.

United States District Court

For the Northern District of California

1    approximately fourteen people.  It is entirely possible that the document in question was merely

2    a previous version of the defense's witness list.

3           While Kermit Harris's statement was not subject to all of the weaknesses of Lewis's

4    statement, counsel could reasonably have elected not to call him.  Significantly, Harris was *not*

5    a witness to the actual physical altercation outside.  His statement does not substantially add to

6    the trial testimony already presented.  At most he would have corroborated Barbara Mack's

7    testimony that Ross talked aggressively before the fight.  Tough talk, however, would not have

8    justified the brutal beating.  The overwhelming physical evidence was that the fight was one-

9    sided.  Moreover, contrary to petitioner's claim, the record suggests that Mr. Robinson had in

10   fact made a strategic decision not to call Harris.  At the November 7 proceedings, in his answer

11   to the judge's question of whether he intended to call Harris as a witness, Mr. Robinson

12   answered that although he initially considered calling Harris for impeachment purposes, he did

13   not anticipate that it would be required (Exh. 13 at 5).  This answer shows a degree of tactical

14   decision-making, not simply sloth.

15          It is also entirely possible that trial counsel's decision not to call Harris and Lewis was a

16   strategic decision to avoid a continuance sought by the prosecutor.  Mr. Robinson could

17   reasonably have believed the defense was ready to go to trial and would have an advantage over

18   the prosecution in beginning trial immediately rather than postponing.

19          In addition to petitioner's claims regarding the Harris and Lewis testimonies, petitioner

20   also faults trial counsel for not spending adequate time interviewing or meeting with him prior

21   to trial.  Petitioner alleges that he only met with Mr. Robinson during court appearances, and

22   that these meetings never lasted more than ten to fifteen minutes.  He also asserts that he

23   complained to Mr. Robinson on several occasions that he did not believe that the brief meetings

24   provided sufficient time to prepare for trial.  Self-serving statements, however, are often

25   insufficient to overcome the presumption of validity accorded to state convictions.  *See Turner*

26   *v. Calderon*, 281 F.3d 851, 881 (9th Cir. 2002).  Although petitioner now claims that counsel's

27   approach resulted in his conviction, there is no indication in the trial record that petitioner ever

28   expressed any concern or disagreed with his representation or trial strategy prior or during his

**United States District Court**
For the Northern District of California

trial.  In fact, Mr. Robinson avers in his declaration that "I discussed trial strategy with Mr. Bracey during the trial and he seemed to agree with my advice.  At no time during the trial did he indicate that he was unsatisfied nor did he tell me that [he] wished that other witnesses be called." (Exh. E).  Mr. Robinson also asserts that both he and an investigator, Willie C. Pierson, interviewed and met with petitioner prior to accepting the case.  In addition, in light of the fact that petitioner is a two-time convicted felon, the decision not to put him on the stand was within the scope of professional decision-making because of the impeachment value of the previous convictions.  This order finds that petitioner's self-serving declaration is insufficient to support his claim of inadequate representation.

*          *          *

Under *Strickland*, however, a showing of deficient trial counsel performance is not sufficient to establish a successful habeas claim.  A petitioner also must establish that prejudice resulted from the deficient performance.  *See e.g., Bloom v. Calderon*, 132 F.3d 1267, 1270–71 (9th Cir. 1997).  In other words, a petitioner must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

Petitioner claims that counsel's waiver of the Lewis and Harris testimony was prejudicial because their testimony was critical to his defense.  He reasons that because there were no bystander witnesses to the actual fight, and that the jury verdict was such a close decision, Ross's credibility was therefore essential to the prosecution's case.  If the jury did not believe Ross's testimony regarding the events before the fight, then they would be less inclined to believe his testimony describing the actual fight.  Since Barbara Mack's credibility was attacked due to her felony conviction for drug-trafficking, the petitioner's argument continues, then the two witness testimonies from Harris and Lewis would therefore be necessary to corroborate Mack's testimony that Ross was the initial aggressor in the bar.

Given the facts and circumstances of this case, however, this order holds that petitioner has failed to demonstrate such prejudice.  As discussed above, Cheryl Lewis's testimony would

10

have been extremely weak. Kermit Harris's testimony while stronger, would still not have been sufficient to overcome the force of the brutality shown by the physical evidence. Ross suffered a broken nose, fractured eye sockets requiring insertion of steel plates, and has permanent nerve damage on the right side of his face. Officer Hall, Mack, and Bronko all testified to the extent of Ross's injuries. Hall stated that when he arrived on the scene, he found Ross severely beaten and bleeding profusely. Bronko described how a large pool of blood had collected on the ground. Tough talk in the bar could not have justified the brutal attack. There were no injuries to petitioner. Even if Ross had thrown a punch at petitioner, it is obvious that petitioner responded far more aggressively than any circumstances could have warranted. The physical evidence on this point was overwhelming. Pure and simple, petitioner pummeled Ross senseless. Petitioner was convicted, deservedly so. Nothing the lawyer might have done differently could have altered the outcome. This claim for relief fails.

**CONCLUSION**

For the reasons stated, the petition for writ of habeas corpus is **DENIED**. A judgment so providing shall issue. The Clerk **SHALL CLOSE THE FILE**.


**IT IS SO ORDERED.**


Dated:  August 2, 2005.



WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE